UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MEGAN E. DURHAM,<br><br>     Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>     Defendant. | Case No. 1:22-CV-465 JD |

**OPINION AND ORDER**

Plaintiff Megan Durham appeals the denial of her claim for Disability Insurance Benefits. For the reasons below, the Court will remand this matter to the Commissioner for further proceedings consistent with this opinion.

**A.  Relevant Medical Evidence and ALJ's Finding**

Ms. Durham claims that she became disabled in May 2020 when she was 50 years old. At the time, she was working as a head cashier at a hardware store when she tripped on a mat and fell, injuring her knee. For a time, she received short-term disability benefits, but because of the injury could not return to her job. In May 2021, she was hired by a digital business company to work from home but quit the job after one week. She said she was unable to continue working due to severe shoulder and neck pain while typing on the computer.

In June 2020, Ms. Durham applied under Title II for disability insurance benefits.[1] Her application was denied initially and on reconsideration. Following a hearing, an Administrative

---

[1] While Ms. Durham is represented by counsel on appeal, she had no representation at the administrative level. (R. at 58.)

Law Judge ("ALJ") issued an unfavorable decision in May 2022, and the Agency's Appeal Council denied Ms. Durham's request for review, making the ALJ's decision the final decision of the Commissioner.

In conducting the sequential analysis to determine whether Ms. Durham was disabled, the ALJ found at step two that Ms. Durham suffered from four severe impairments: foraminal stenosis at C3–6, osteopenia, peripheral vascular disease, and obesity. (R. at 36.) In addition, the ALJ noted that Ms. Durham alleged to be suffering from "osteoarthritis in the ankles/feet, as well as heel spurs, rheumatoid arthritis, knee issues, and gout," but the ALJ did not find these conditions to be severe impairments as they did not interfere with her ability to work irrespective of age, education, and experience. (R. at 36–37.) Next, the ALJ determined that, although Ms. Durham claimed venous insufficiency, a condition mentioned once in the record, "a venous reflux ultrasound specifically ruled out DVT" (R. at 36), and she did not return for a follow-up appointment. The ALJ wrapped up her assessment by concluding that "when considered in combination with all complaints, these [physical conditions] do not support the imposition of significant limitations of function in excess of those outlined in the Residual Functional Capacity or for 12-months or longer." (*Id*. at 36–37.)

In considering Ms. Durham's complaints of anxiety and depression, the ALJ determined that the clinical findings did not show that these conditions were adversely affecting her ability to work. In particular, the ALJ concluded that Ms. Durham has "no limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; no limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing oneself." (*Id.* at 37.)

At step three, the ALJ found that Ms. Durham has no impairments, or combination of impairments, that meets or medically equals the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. (R. at 37–38.)

In considering Ms. Durham's residual functional capacity ("RFC"), the ALJ found that Ms. Durham can perform sedentary work, except that she can occasionally climb stairs or ramps, stoop, kneel, crouch, or crawl but can never climb ladders, ropes, or scaffolds, or balance. She may occasionally be exposed to wetness, dangerous moving machinery, and unprotected heights. At work she must have an option to change positions no more than every 30 minutes while remaining on task. Finally, she needs a cane to walk more than fifty feet.

In light of this RFC, the ALJ found that Ms. Durham cannot perform any past relevant work, but that other jobs were available in significant numbers in the national economy. In particular, she could work as a gambling cashier, a check cashier, and a food checker. The ALJ thus determined that Ms. Durham was not disabled for the purposes of her application for the disability insurance benefits. *See* 20 C.F.R. § 404.1520 ("If you can make an adjustment to other work, we will find you not disabled. If you cannot, we will find you disabled.").

**B.      Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This

evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.**     **Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to

determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.     Discussion**

On appeal, Ms. Durham argues that the ALJ erred in evaluating her medically determinable impairments at step two of the sequential evaluation which resulted in an unsupported denial of benefits at step five. According to Ms. Durham, the ALJ failed to consider all of her impairments in combination, failed to appreciate the severity of her conditions, and "played doctor" by evaluating new medical evidence without the benefit of a medical professional.

On the other hand, the Commissioner argues that the ALJ did discuss all impairments identified by Ms. Durham and properly considered their impact in the RFC analysis. The Commissioner submits that Ms. Durham has not shown that any of the impairments caused greater functional limitations than the ALJ found.

To begin with, Ms. Durham spends a lot of time arguing that the ALJ erred in her step two analysis. But that argument is inconsequential because step two is a threshold step into the disability determination which the ALJ crossed by finding four severe impairments: foraminal stenosis of her cervical spine, osteopenia; peripheral vascular disease, and obesity. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015) ("The consideration, therefore, of an individual's symptoms at step 2 is done in the context of step 2's threshold nature. 'Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment.'") (quoting *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012)). Accordingly, there is no need for a separate step two analysis.

Next, Ms. Durham argues that the ALJ erred in failing to mention at step three that she was diagnosed with fibromyalgia and chronic pain syndrome; failed to consider the effects of

venous reflux diagnosis; failed to develop the record regarding her mental impairments; and failed to solicit input from medical experts regarding her MRI findings. The Court will start with Ms. Durham's MRI report, which, as it turns out, controls this case.

**(a)** *Ms. Durham's January 17, 2022, MRI Report*

Ms. Durham alleges that she became disabled on May 12, 2020, when she fell at work after tripping on a mat (R. at 295, 315) and began receiving short-term disability benefits (R. at 75–76). She claims that by the time of her fall, she suffered from arthritis in her ankles and feet, causing her pain to the point that she would cry at the end of her workday and could not do anything at home. (*Id.*) She says that the fall aggravated her condition, making it so she could not return to work. Over the next year and a half, Ms. Durham attended many medical appointments, which the ALJ reviewed in great detail and concluded that they did not corroborate her claims of disability.

The following is a summary of the ALJ's findings. The ALJ observed that shortly after her fall, the records of Dr. Coats show "no significant sustained left knee condition with x-rays noting mild to moderate degenerative joint disease." (R. at 42.) Dr. Coats recommended conservative treatment, and nothing indicates a need for surgery. (R. at 42.) Medical notes from May 26, 2020, and June 24, 2020, reflect that, while Ms. Durham was complaining of knee pain and swelling, the examinations were unremarkable. (R. at 42.) In July 2020, Ms. Durham began seeing a pain management physician, Dr. Kinne, complaining of numbness in the left knee, weakness and problems with both wrists, years of joint pain in shoulders, wrists, elbows, knees and ankles and alike. However, despite these complaints of severe pain, and although Ms. Durham presented with antalgic gait and needed to use a cane, Dr. Kinne found her to be in no

acute distress with full normal appearance, full orientation, and normal mood and no motor deficits in her arms. (R. at 42.) On August 18, she saw Dr. Kinne and again complaining of pain at the severity of seven on a ten-point scale but at the same time claimed that her pain had improved with use of Gabapentin. (R. at 43.) On August 27, Ms. Durham visited a vein center to rule out deep vein thrombosis. The procedure was inconclusive, but Ms. Durham did not return for a follow up procedure, even though her nurse practitioner continued to suspect that she was suffering from this condition. She was prescribed a treatment with a compression hose and was told to elevate her legs as much as possible. She was also referred to cardiovascular surgery.

On May 12, 2021, Ms. Durham was hired by Intelenet America. (R. at 183.) This was a teleworking job requiring Ms. Durham to type on a computer. She quit after one week claiming that she could not work due to shoulder and neck pain. (R. at 80, 126.)

On July 15, 2021, Ms. Durham saw Dr. Kinne with complaints of severe back, knee, and foot pain as well as of worsening shoulder and neck pain. By then she had lost her health insurance coverage and had not taken Gabapentin for some time. Dr. Kinne observed no gross motor deficits in the arms nor leg swelling, but did note that she had antalgic gait and used a cane. On July 29, Ms. Durham saw a nurse practitioner complaining of hand tremors, high blood pressure, restless leg syndrome, anxiety, and depression, but as the ALJ noted, the exam revealed no significant deficits, except that Ms. Durham exhibited tremors in both hands. (R. at 43.)

Beginning on August 11, 2021, Ms. Durham started seeing a neurologist, Dr. Lium. She first went to see him for hand tremors that worsened over the previous year. The ALJ observed that Ms. Durham appeared to be in no acute distress and the examination did not show significant deficits although she did have hand tremors and claimed to be fatigued. A month later, on September 13, Ms. Durham saw her nurse practitioner for high blood pressure but did

not otherwise complain of any serious health issues. Three days later, she had a follow up appointment at a pain management clinic when she reported another fall while getting mail. She complained of pain at the level of eight on a ten-point scale and had antalgic gait while using a cane. In reviewing the appointment notes, the ALJ observed that Ms. Durham did not present in acute distress, was fully oriented with normal mood and judgment, and had no leg swelling. (R. at 43–44.)

Ms. Durham saw Dr. Liu again on November 11, 2021. She complained of numbness in her arms, hand tremors, and worsening of dizziness when turning her head, which Dr. Liu attributed to her obesity. The ALJ noted that despite these allegations she had full muscle strength and the visit notes do not indicate leg swelling, acute or apparent distress, or that she needed to continue using a cane. In detailing this visit, the ALJ summarized a report of an MRI of cervical spine (neck region of the spinal column) that Mrs. Durham underwent more than two months after visiting Dr. Liu:[2]

> Results of cervical MRI reflect multi-level spondylosis and uncovertebral hypertrophy contributing to significant foraminal stenosis at the C3-C6 level on the left most severe at the C3-C4 and C4-C5 levels with mild canal stenosis also at these levels.

(R. at 44.)

The MRI report was the last piece of medical evidence in the record. Ms. Durham's hearing before the ALJ took place on November 30, 2021. (R. at 55.) At the end of the hearing, the ALJ invited Ms. Durham to submit any other medical records that were not already in evidence. On February 25, 2022, Ms. Durham sent a letter to the ALJ further describing her complaints and indicating that she had submitted an MRI report which she believed "answers a

---

[2] The MRI was conducted on January 17, 2022.

9

lot of my questions about the pain I was getting from my neck" when attempting to work from home. (R. at 272.) The ALJ issued her opinion on May 5, 2022. She did not submit the MRI report to any medical expert for review.

The ALJ's decision not to submit the MRI report to a medical expert but to treat it as supportive of Dr. Liu's overall assessment of Ms. Durham on November 11, 2021, amounts to "playing doctor." As presented in the ALJ's opinion, the report is included in support of Dr. Liu's clinical observations, but Dr. Liu did not have the benefit of the report when Ms. Durham visited him. In fact, Ms. Durham underwent the MRI two months after that visit. Without Dr. Liu or someone else with expertise to interpret such reports, the ALJ is not in the position to know whether the report corroborates or contradicts Ms. Durham's claims of shoulder and neck pain. Having opinions from medical experts is necessary to reach an RFC determination. An ALJ, who has no medical training, would not be equipped to interpret an MRI report unaided by a medical expert. It is due to this lack of expertise that the Seventh Circuit has repeatedly advised that ALJs are unqualified to conclude that medical records support their RFC "without an expert opinion" to interpret those medical records. *Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) ("The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion."); *see Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) ("This court has stated repeatedly that an ALJ may not 'play[] doctor and interpret new and potentially decisive medical evidence without medical scrutiny.'"); *see Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) ("Fatally, the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence.").

The Commissioner argues that the ALJ committed no error because she simply repeated the MRI report, rather than ascertain its meaning. In support of this argument, the Commissioner relies on *Durham v. Kijakazi*, 53 F.4th 1089 (7th Cir. 2022), *DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 3287974 (7th Cir. Aug. 11, 2022) (unpublished), and *Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (unpublished). However, these cases are distinguishable.

The Commissioner submits that *Durham* stands for the proposition that the ALJ need not submit an MRI report to further medical scrutiny and may rely on such a report verbatim. In taking this position, the Commissioner misrepresents what *Durham* teaches. In *Durham*, the plaintiff argued that the ALJ relied on stale opinions of medical experts in issuing his decision, which were rendered unreliable by her subsequent hospitalization. The plaintiff asserted that the ALJ should have re-submitted her medical evidence for additional expert review in light of changed circumstances and the complexity of evidence. Since that did not happen, the plaintiff accused the ALJ of "playing doctor" when concluding that the earlier evidence did not establish disability. *Durham*, 53 F.4th at 1094. The Court of Appeals found the plaintiff's argument without merit because the ALJ did rely on the conclusions of the treating physicians and considered the most recent evidence:

> Some of [the plaintiff's] tests certainly were complex. But the ALJ did not attempt to interpret, on his own, the significance of any of these medical tests or procedures. Rather, he relied, as he should, on the conclusions of her treating physicians. The most recent evaluation performed by a cardiologist revealed that [the plaintiff] had "mild systemic disease, no acute problems, and no functional limitations." The same report indicated that she had no cardiac instability. Thus, [the plaintiff's] treating cardiologist did all of the interpretation of her exam and procedures; the ALJ simply restated those findings.

*Id.* at 1095. In other words, unlike here, in *Durham* the ALJ relied on and restated the conclusions of the treating physicians who examined the plaintiff and interpreted the exam, but did not rely on the underlying reports. *Durham* therefore does not stand for the proposition that it

11

is sufficient for an ALJ to restate an MRI report when considering whether the plaintiff's claims are supported by substantial evidence.

Additionally, the Court of Appeals noted that in *Durham* the evidence showed that the plaintiff's tachycardia symptoms resembled previous incidents and were resolved within a day after taking medication. *Id.* at 1096. So, there was no need to submit this latest occurrence for additional medical review. Here, however, Ms. Durham claimed that her shoulder and neck pain worsened in May 2021, and the January 2022 MRI was the only MRI in the record that could help explain those symptoms.

Next, the Commissioner cites *DuCharme*, 2022 WL 3287974, for the proposition that there is no need for additional physician review of medical records. But that's not what *DuCharme* stands for. In *DuCharme*, the plaintiff's relevant medical history spanned from 2016 through 2018. *Id.* at *1. In early 2016, the plaintiff developed lung issues. A year later, he received a diagnosis of a herniated disc. In Spring 2018, the plaintiff further injured his back when lifting a transmission. That summer, he underwent surgery, receiving a lumbar fusion and discectomy. He did not seek more medical treatment for his back pain after July 2018. *Id.* Shortly after his back surgery, the plaintiff began experiencing pain in his right elbow, which led to elbow surgery and injections in late 2018. *Id.*

Following the denial of disability insurance benefits, the plaintiff argued on appeal that, because the state consulting physicians had not reviewed his medical records after June 2017, a review by another medical expert was necessary before the ALJ could reach an appropriate RFC based on his back pain. The Court of Appeals disagreed on the grounds that there was no need for an additional consulting physician's review of the records because the ALJ properly relied on the plaintiff's medical records and on opinions from his treating physicians in reaching its

12

conclusion. In other words, while the consulting physicians' review was completed in 2017, there were multiple other records and opinions after 2017 on which the ALJ could base his opinion. Nothing in *DuCharme* suggests that the ALJ is free to ignore new medical evidence that has not been reviewed by any doctor.

Finally, the Commissioner argues that consistent with *Olsen*, 551 F. App'x 868, an ALJ does not "play doctor" where she summarizes the results of an MRI and draws a conclusion as to the severity of the plaintiff's condition. In *Olsen*, the plaintiff underwent five spine and two cervical MRI tests over five years. Each MRI showed similar results — that the plaintiff's spine had a herniated and degenerative disk and that the cervical spine had a bulging or slightly bulging disk. "The neurosurgeon and two orthopedic surgeons who ordered the MRIs recommended only physical therapy after reviewing the test results, and neither specialist declared [the plaintiff] unable to work." *Olsen*, 551 F. App'x at 875. After denial of benefits, the plaintiff claimed on appeal that the ALJ "played doctor" by substituting her own opinion when she stated that the MRIs showed mostly mild abnormalities. *Id*. at 874. The Court of Appeals found no error because the ALJ did not ignore relevant evidence nor substitute her own judgment. *Id*. at 875. But that's different from Ms. Durham's case because, as noted below, the ALJ relied on an incomplete record. Whereas in *Olsen*, the ALJ had the benefit of review by the neurosurgeon and the orthopedic surgeons who ordered the MRIs, the ALJ here did not submit the MRI for an expert's review and despite Ms. Durham's *pro se* status did not seek to develop the record further.

An ALJ must review medical evidence, not merely acknowledge that it exists. The ALJ must explain how particular evidence relates to the RFC findings. *See Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) (ALJ must build a logical bridge from evidence to conclusions); *Craft*

13

*v. Astrue*, 539 F.3d 668, 677–78 (no logical bridge when evidence is recited, but not analyzed). Ms. Durham, who had no representation at the administrative level, submitted the January 17, 2022, MRI report in support of her claim that she could not work a sedentary job that required extensive use of her hands because of shoulder and neck pain. While the ALJ acknowledged the report, she took no steps to complete the record by securing further medical opinions. Yet Social Security hearings are not adversarial proceedings, *see* 20 C.F.R. §404.900(b) ("In making a determination or decision in your case, we conduct the administrative review process in an informal, non-adversarial manner."); *Richardson v. Perales*, 402 U.S. 389, 403 (1971) ("We bear in mind that the agency operates essentially, and is intended so to do, as an adjudicator and not as an advocate or adversary. This is the congressional plan."), and the ALJs have a duty to develop a full and fair record.

> While a claimant bears the burden of proving disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record. See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). This duty is enhanced when a claimant appears without counsel; then the ALJ must "'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'" *Thompson*, 933 F.2d at 585–86 (quoting *Smith v. Sec. of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)); *see Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). Although pro se litigants must furnish some medical evidence to support their claim, see *Johnson v. Barnhart*, 449 F.3d 804, 808 (7th Cir. 2006), the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information. 20 C.F.R. §§ 416.912(d)-(f), 416.919, 416.927(c)(3).

*Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

This did not happen here. Although the ALJ found that foraminal stenosis of the cervical spine was a severe impairment, she failed to develop the record when presented with the MRI report. While there is plenty of evidence in the record contradicting the severity of Ms. Durham's impairments, evidence that might corroborate Ms. Durham's claim must also be considered. *Cf.*

14

*Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support [her] conclusion and explain why that evidence was rejected."). This difference undermines the Commissioner's reliance on *Olsen*. Accordingly a remand is necessary to determine what impact, if any, Ms. Durham's MRI has on her disability claim.

Because the Court is remanding this case for additional consideration, given that all impairments must be considered in reaching the RFC, the Court need not separately address Ms. Durham's other claims on appeal.

### C. Conclusion

The Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 13, 2024

/s/ JON E. DEGUILIO
Judge
United States District Court